UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| NC CAPITAL, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:21-cv-04101-SLD-JEH |
| METABOLOMIC TECHNOLOGIES, INC., | ) ) ) |
| Defendant. | ) |

ORDER

Before the Court are Defendant Metabolomic Technologies, Inc.'s ("MTI") Motion to Dismiss Plaintiff's Complaint, ECF No. 10, and Motion for Leave to File a Reply in Support of its Motion to Dismiss, ECF No. 13. For the reasons that follow, the motions are GRANTED.

**BACKGROUND**[1]

Plaintiff NC Capital, LLC ("NC Capital") is "a family-owned investment firm that invests in emerging healthcare companies." Compl. ¶ 1, ECF No. 1. MTI is a Canadian corporation that specializes in metabolomics, or "the measurement of 'metabolites,' [which are] small molecules that result from a metabolic reaction found in human specimens." *Id.* ¶¶ 2, 8.

In May 2019, NC Capital and MTI began discussing NC Capital making an investment in MTI. NC Capital alleges that MTI, through its then-CEO and one of its directors, made misrepresentations "to induce NC Capital to make a substantial investment in MTI." *Id.* ¶ 18. The misrepresentations related to MTI's leading product, PolypDx, a test that MTI represented could "ascertain through a urine sample whether a given patient has pre-cancerous colorectal

---

[1] At the motion to dismiss stage, the court "accept[s] as true all well-pleaded facts in the complaint, and draw[s] all reasonable inferences in [the plaintiff's] favor." *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). Thus, the facts included in the background section are based on the complaint, ECF No. 1.

1

polyps." *Id.* ¶ 2. MTI represented that it had finalized an algorithm for detecting "selected urine metabolites that correspond to pre-cancerous colorectal polyps." *Id.* ¶ 18. And it represented "that 'the majority of the work' in the algorithm was being performed by the selected urine metabolites, as opposed to ordinary demographic and clinical risk factors (like sex, age, and smoking status) that are observable through a routine check-up." *Id.* ¶ 19.

Based on these representations, NC Capital committed to invest in MTI. It signed a term sheet on June 2, 2019. "On August 7, 2019, [it] contracted to purchase securities in MTI in two tranches of $ 1 million (USD) each, including warrants of $560,000 upon the funding of the two investment tranches." *Id.* ¶ 22. Pursuant to that contract, NC Capital invested $2,560,000 between August 2019 and October 2020. NC Capital currently owns fifteen percent of MTI.

In late October and early November 2020, NC Capital learned that MTI's representations about PolypDx were false. In fact, "ordinary demographic and clinical risk factors, observable by any physician in a routine clinical setting, were doing the bulk of the work in the PolypDx algorithm." *Id.* ¶ 28. NC Capital discovered that internal MTI data existing prior to NC Capital's investment confirmed this and that MTI scientists had told MTI management in 2012 that the PolypDx algorithm did not primarily rely on metabolites. NC Capital would not have invested in MTI if it had been aware of these facts.

NC Capital brings suit against MTI asserting claims under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78qq, and the Illinois Securities Law of 1953, 815 ILCS 5/1–19, a claim that MTI fraudulently induced it to invest in MTI, a claim that MTI negligently made misrepresentations with the intent to induce it to invest, and a claim that MTI was unjustly enriched by its investment. *See id.* ¶¶ 35–61. MTI moves to dismiss the complaint pursuant to a forum selection clause, for lack of personal jurisdiction, and for failure to state a claim. Mem.

Supp. Mot. Dismiss 1–2, ECF No. 11.  NC Capital opposes the motion.  Mem. Opp'n Mot. Dismiss. 1–3, ECF No. 12.  MTI moves for leave to file a reply in support of its motion to dismiss, *see generally* Mot. Leave Reply, to which NC Capital has filed a response in opposition, Mem. Opp'n Mot. Leave Reply, ECF No. 14.

## DISCUSSION

### I. Motion for Leave to File a Reply

For all motions other than summary judgment, "[n]o reply to the response is permitted without leave of Court."  Civil LR 7.1(B)(3).  "Typically, reply briefs are permitted if the party opposing a motion has introduced new and unexpected issues in his response to the motion, and the Court finds that a reply from the moving party would be helpful to its disposition of the motion."  *Shefts v. Petrakis*, No. 10-cv-1104, 2011 WL 5930469, at *8 (C.D. Ill. Nov. 29, 2011).  A court may also permit a reply "in the interest of completeness."  *Zhan v. Hogan*, Case No. 4:18-cv-04126-SLD-JEH, 2018 WL 9877970, at *2 (C.D. Ill. Dec. 18, 2018).

MTI seeks leave to file a reply to address new evidence submitted by NC Capital—an expert report about Canadian law and a declaration from a member of NC Capital regarding facts relevant to personal jurisdiction, *see* Mot. Leave Reply ¶¶ 5–7—and to respond to NC Capital's arguments about Canadian law and provide the Court with the underlying authorities cited by NC Capital's expert, *id.* ¶¶ 8–9.  It states that it "did not address Canadian law in its opening brief because NC[ Capital] did not allege in the Complaint that Canadian law applied."  *Id.* ¶ 9.  NC Capital opposes MTI's motion, arguing that MTI is attempting to have "a do-over," going beyond replying to new evidence and arguments and instead "repeat[ing] and attempt[ing] to supplement the arguments [it] made" in the motion to dismiss.  Mem. Opp'n Leave Reply 1.  Moreover, NC Capital argues that MTI should not have been surprised by NC Capital's

3

reference to Canadian law because the forum selection clause MTI seeks to enforce directly follows a choice of law clause indicating that the agreement containing the forum selection clause is governed by Canadian law. *Id.* at 1–2.

While the Court agrees that MTI could have addressed Canadian law in the motion to dismiss, it would be helpful for the Court to consider the Canadian cases MTI attaches to its proposed reply and its argument regarding interpretation of the forum selection clause under Canadian law. Thus, in the interest of completeness, the Court GRANTS the motion for leave to file a reply. The Clerk is directed to file the reply, ECF No. 13-1, on the docket.

## II.     Motion to Dismiss

MTI moves to dismiss the complaint on three bases: first, that the parties are bound to litigate this claim in Alberta, Canada under a forum selection clause; second, that the Court lacks personal jurisdiction over it; and third, that NC Capital's complaint fails to state a claim. Mem. Supp. Mot. Dismiss 1–2. NC Capital responds that the forum selection clause must be interpreted under Canadian law and is not broad enough to cover the claims in this suit, that the Court does have personal jurisdiction over MTI, and that its complaint states a claim. Mem. Opp'n Mot. Dismiss. 1–3. As the Court finds that the complaint must be dismissed because of the forum selection clause, it does not address MTI's alternate arguments.

The Subscription Agreement between the parties, under which NC Capital agreed to purchase stock in MTI, contains a provision with a forum selection clause and a choice of law clause. *See* Subscription Agreement, Terms and Conditions ¶ 14, Mem. Supp. Mot. Dismiss Ex. B, ECF No. 11-1 at 7–41.[2] In full, it provides:

---

[2] In addition to the allegations in the complaint itself, a court can consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" when ruling on a motion to dismiss. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

> The contract arising out of this Subscription Agreement and all documents relating thereto is governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein. The parties irrevocably attorn to the exclusive jurisdiction of the courts of the Province of Alberta.

*Id.* MTI argues that pursuant to this clause, NC Capital has agreed to litigate the claims in the complaint in Alberta, Canada and the case should be dismissed. Mem. Supp. Mot. Dismiss 5–6. NC Capital argues that its claims fall outside the scope of the forum selection clause because the clause "plainly does not contemplate tort-based claims." Mem. Opp'n Mot. Dismiss 6–7.

When parties agree "to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). Where the forum-selection clause provides for a state or foreign forum—to which the court has no power to transfer the case—"the appropriate way to enforce [the] . . . clause . . . is through the doctrine of *forum non conveniens*." *Id.* at 60. "[C]ourts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." *Id.* at 61. Accordingly, before dismissing a case under the *forum non conveniens* doctrine pursuant to a forum selection clause, the court must determine whether the clause is valid and enforceable, *see AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 525 (7th Cir. 2001), and whether the claims at issue in the case are covered by the forum selection clause, *see Abbott Lab'ys v. Takeda Pharm. Co.*, 476 F.3d 421, 424 (7th Cir. 2007) (after finding a forum selection clause valid, "turn[ing] to the question of its meaning" and concluding that "it certainly embrace[d] [the plaintiff's] suit"). Here, however, neither party makes an argument regarding the forum

---

The Subscription Agreement is referred to in the complaint, *see* Compl. ¶ 22 (alleging that NC Capital "contracted to purchase securities in MTI" on August 7, 2019); Subscription Agreement, Execution Copy 3 (bearing a signature dated August 7, 2019), and it is critical to the complaint as NC Capital's investment forms the basis of the suit. Moreover, NC Capital does not object to the Court's consideration of the agreement at this stage.

selection clause's validity or enforceability, so the Court focuses its inquiry on whether the claims asserted in this suit fall within the forum selection clause's ambit.

The parties dispute what law the Court should apply in determining whether the clause encompasses NC Capital's claims: American federal law, *see* Mem. Supp. Mot. Dismiss 5–6 (citing to federal cases), or Canadian law, Mem. Opp'n Mot. Dismiss 6. Neither provides a sustained analysis on the issue.[3] The Court finds it unnecessary to decide because under either federal law or Canadian law, NC Capital's claims—which, again, are securities fraud, Compl. ¶¶ 35–46, fraudulent inducement to invest in MTI, *id.* ¶¶ 47–52, negligent misrepresentation with the intent to induce NC Capital to invest, *id.* ¶¶ 53–57, and unjust enrichment, *id.* ¶¶ 58–61—are covered by the forum selection clause.

   a. **American Federal Law**

MTI argues that NC Capital "cannot side-step its agreement to a forum selection clause by alleging claims sounding in fraud, rather than breach of contract." Mem. Supp. Mot. Dismiss

---

[3] In support of its argument that Canadian law applies because of the contract's choice of law provision, NC Capital cites one district court case. Mem. Opp'n Mot. Dismiss 6 (citing *Brady v. Sperian Energy Corp.*, 18 C 6968, 2019 WL 2141968 (N.D. Ill. May 16, 2019)). In *Brady*, the court stated that "[d]etermining whether the forum selection clause applie[d] to th[e] suit require[d] interpreting the clause under the law designated in the [contract's] choice of law clause." *Brady*, 2019 WL 2141968, at *2 (quotation marks omitted). For this proposition, the court relied on two Seventh Circuit cases: *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 775 (7th Cir. 2014), and *Abbott Laboratories*, 476 F.3d at 423. But those cases only address what law courts should apply in diversity cases. *See Abbott Lab'ys*, 476 F.3d at 423 (noting that the court had previously "left open the question whether federal or state law governs the validity and interpretation of [forum selection] clauses in diversity suits" and then deciding that "[s]implicity argues for determining the validity and meaning of a forum selection clause . . . by reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears rather than making the court apply two different bodies of law in the same case" (citations omitted)); *Jackson*, 764 F.3d at 774–75 (explaining that the Seventh Circuit's position that in diversity cases courts apply the law that governs the rest of the contract to determine the validity and meaning of a forum selection clause is the minority position and citing cases). NC Capital brings this suit under the Court's federal question jurisdiction and supplemental jurisdiction. *See* Compl. ¶ 9. Though it also alleges that diversity jurisdiction exists, *id.* ¶ 10, its allegations are insufficient to support finding diversity jurisdiction. "[L]imited liability companies are citizens of every state of which any member is a citizen." *Belleville Catering Co. v. Champaign Mkt. Place, L.L.C.*, 350 F.3d 691, 692 (7th Cir. 2003). NC Capital alleges that its "members are domiciled in Illinois," Compl. ¶ 10, but without knowing who its members are, that does not necessarily show that its members are citizens of Illinois. If NC Capital has any members that are corporations, for example, citizenship would be determined by place of incorporation and principal place of business. *See* 28 U.S.C. § 1332(c)(1). And if NC Capital has any members that are limited liability companies, the Court would need to know where those companies' members are citizens.

6. Under federal common law, the Court agrees. *Kochert v. Adagen Medical International, Inc.*, 491 F.3d 674 (7th Cir. 2007), is on point. The contractual provision at issue covered choice of law, venue, forum, and arbitration. *Id.* at 677–78. As relevant here, it provided that the agreement and the rights and obligations of the parties would be "governed by and construed in accordance with the laws of the State of Georgia" and that the plaintiff "agree[d] to consent to jurisdiction, venue and forum in the State Court of Fulton County, Georgia." *Id.* at 677 (quotation marks omitted). The plaintiff brought suit in federal district court alleging that the defendant fraudulently induced her to enter the contract, and the defendant moved to dismiss for improper venue. *Id.* at 675–76. The Seventh Circuit affirmed dismissal based on the forum selection clause because the "clause contain[ed] no language limiting its application to certain categories of claims or remedies." *Id.* at 676. It explained that because the forum selection clause was not limited to claims for breach of contract, the provision was "most reasonably interpreted to encompass [the plaintiff's] fraudulent inducement claim," noting that the "fraudulent inducement claim stem[med] from her contractual relationship with" the defendant. *Id.* at 679.

Similarly, here, the forum selection clause contains no language limiting its scope to particular categories of claims. It merely provides that "[t]he parties irrevocably attorn to the exclusive jurisdiction of the courts of the Province of Alberta." Subscription Agreement, Terms and Conditions ¶ 14. Moreover, like in *Kochert*, all of NC Capital's claims stem from its contractual relationship with MTI. The Subscription Agreement was the contract under which NC Capital agreed to purchase the $2,560,000 in securities from MTI, *see* Compl. ¶ 22 (alleging that "[o]n August 7, 2019, NC Capital contracted to purchase securities in MTI"); Subscription Agreement, Execution Copy 3 (bearing a signature dated August 7, 2019). And the claims all

7

allege that this investment was NC Capital's injury. *See* Compl. ¶ 40 (alleging that "NC Capital reasonably relied on MTI's representations in purchasing $2,560,000 in securities"); *id.* ¶¶ 45, 50, 56 (similar); *id.* ¶ 59 (alleging that "NC Capital conferred a benefit on MTI by investing $2,560,000 in MTI"). Thus, the forum selection clause is "most reasonably interpreted to encompass" NC Capital's claims. *See Kochert*, 491 F.3d at 679. Indeed, the Seventh Circuit has repeatedly recognized that forum selection clauses that apply to disputes over a contract can encompass tort claims similar to NC Capital's claims. *See, e.g.*, *Am. Patriot Ins. Agency, Inc., v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 889 (7th Cir. 2004) ("[A] dispute over a contract does not cease to be such merely because instead of charging breach of contract the plaintiff charges a fraudulent breach, or fraudulent inducement, or fraudulent performance."); *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 438, 444 (7th Cir. 2012) (holding in a case where the plaintiffs brought suit alleging that the defendants defrauded them into buying interests in vacation villas that a forum selection clause applying "to any 'controversy on the interpretation and compliance with the rights and obligations of' the contracts of sale . . . [wa]s broad enough to encompass" the plaintiffs' tort claims).

    NC Capital makes a brief argument that under federal common law, its claims are not within the scope of the forum selection clause. Mem. Opp'n Mot. Dismiss 7–8. But it cites only out-of-date, inapplicable, and out-of-circuit cases. For example, in *Pegasus Transportation, Inc. v. Lynden Air Freight, Inc.*, 152 F.R.D. 574, 575 (N.D. Ill. 1993), the plaintiff had successfully moved to remand its suit for additional tariff fees to state court based on a forum selection clause contained within the tariff. The defendant moved to reconsider, arguing that "the forum selection clause d[id] not apply to over half the shipments transported by" the plaintiff because it was not effective until after those shipments had been transported. *Id.* The plaintiff agreed that

many of the shipments occurred before the forum selection clause became effective but asked the court to remand the portion of the case related to shipments that were covered by the forum selection clause. *Id.* The court had to decide "the appropriate remedy [for] when a large portion of related federal question claims are properly removed and another portion of those claims are subject to a valid forum selection clause violated by removal to federal court." *Id.* at 576. The court did not enforce the forum selection clause at all, deciding instead to retain jurisdiction over the whole case, explaining that it would have been unreasonable to remand half of the claims when the plaintiff, who sought to enforce the forum selection clause, had structured its own complaint to include both covered and non-covered claims. *See id.* at 576–77 ("Pegasus could not bury [the properly removable claims] with post-effective-date claims, in an undifferentiated count, in an attempt to broaden the scope of the forum selection clause and thereby defeat [the defendant's] removal right."). The facts of *Pegasus* are entirely different than the case at bar. In *Pegasus*, the plaintiff (the party that formulated the complaint) sought to enforce the forum selection clause, the parties agreed that some of the claims were covered by the forum selection clause and some were not, and the issue was the temporal scope of the clause, not the interpretive scope. *See id.*[4] The other cases cited by NC Capital are similarly inapposite.

Thus, to the extent federal law applies to interpretation of the forum selection clause, the Court finds that it encompasses NC Capital's claims.

### b. Alberta, Canada Law

NC Capital argues that "[u]nder Alberta Law, for a forum selection clause to mandate jurisdiction in a Canadian court, the clause must clearly and precisely confer exclusive

---

[4] Interestingly, the court in *Pegasus* also noted that "courts have applied forum selection clauses to entire complaints where plaintiffs have attempted to *avoid* the application of a contract's forum selection clause by stating claims sounding in tort but related to the contract," *Pegasus*, 152 F.R.D. at 576 n.3, which is more similar to the facts of this case.

9

jurisdiction in that court." Mem. Opp'n Mot. Dismiss 7 (quotation marks omitted).  It provides an expert report from Blair Yorke-Slader, a barrister and solicitor qualified to practice law in Alberta, Canada to support its argument.  *See* Yorke-Slader Report, Mem. Opp'n Mot. Dismiss Ex. B, ECF No. 12-1 at 6–24.  MTI disputes that any of the cases cited by NC Capital's expert support NC Capital's position.  *See* Reply 7.

Federal Rule of Civil Procedure 44.1 provides that determination of foreign law is a question of law and that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  This rule "permits foreign law to be proved by . . . affidavits of experts . . . . [And] it also permits judges to consult other sources of foreign law, such as articles, treatises, and judicial opinions."  *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 495 (7th Cir. 2009).  The Seventh Circuit has cautioned that "[r]elying on paid witnesses to spoon feed judges is justifiable only when the foreign law is the law of a country with such an obscure or poorly developed legal system that there are no secondary materials to which the judge could turn."  *Id.* at 496.  Because MTI provides the Court with the underlying cases that Yorke-Slader relies on, the Court will read the cases itself and rely on its own interpretation of Canadian law.  *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 628 (7th Cir. 2010) ("The court may . . . wish to reexamine and amplify material that has been presented by counsel in a partisan fashion or in insufficient detail." (quotation marks omitted)).

The Canadian Supreme Court "has recognized that [forum selection clauses] are generally to be encouraged by the courts" and are "regularly enforced."  *Douez v. Facebook, Inc.*, 2017 SCC 33, ¶ 24 (Can.), Reply Ex. E, ECF No. 13-1 at 215–304 (quotation marks

omitted). As relevant here,[5] the party seeking to enforce "the forum selection clause must establish that the clause is valid, clear and enforceable and that it applies to the cause of action before the court." *Id.* ¶ 28 (quotation marks omitted). The court applies the principles of contract law to determine whether the party has met its burden. *Id.* Contractual interpretation under Alberta law does not appear to differ materially from standard contract interpretation principles. The court "must read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of formation of the contract." *Sattva Cap. Corp. v. Creston Moly Corp.*, 2014 SCC 53, ¶ 47 (Can.), Reply Ex. O, ECF No. 13-1 at 623–79.[6]

Based on the cases cited by NC Capital's expert and provided by MTI, the Court concludes that, under Alberta law, the forum selection clause should be interpreted as applying to claims related to the contract and, furthermore, that NC Capital's claims are related to the contract. *Yara Belle Plaine Inc. v. Ingersoll-Rand Company*, 2014 SKQB 254 (Can. Sask. Q.B.), Reply Ex. R, ECF No. 13-1 at 734–73, involved a similar clause to the one at issue.[7] The defendant sought to stay the case pursuant to a forum selection clause requiring disputes between the parties to be litigated in Alberta courts. *See id.* ¶¶ 2–3. The parties entered into seven

---

[5] Canadian "courts apply a two-step approach to determine whether to enforce a forum selection clause." *Douez*, 2017 SCC at ¶ 28. The first step is to determine whether the forum selection clause is "valid, clear and enforceable and . . . applies to the cause of action before the court." *Id.* (quotation marks omitted). At the second step, the party opposing enforcement of the forum selection clause "must show strong reasons why the court should not enforce the forum selection clause." *Id.* ¶ 29. As neither side addresses enforceability, the Court focuses its inquiry on step one.
[6] Moreover, to be enforced, a forum selection clause "must be mandatory and must clearly and precisely confer exclusive jurisdiction on the foreign authority." *GreCon Dimter inc. v. J.R. Normand inc.*, 2005 SCC 46, ¶ 27 (Can.), Reply Ex. H, ECF No. 13-1 at 336–67. The forum selection clause here is both mandatory and clearly provides for exclusive jurisdiction in Alberta courts. *See* Subscription Agreement, Terms and Conditions ¶ 14 ("The parties *irrevocably attorn* to the *exclusive* jurisdiction of the courts of the Province of Alberta." (emphases added)). To the extent NC Capital and its expert take *GreCon Dimter* to mean that the clause must clearly and precisely confer jurisdiction over particular causes of action, *see* Mem. Opp'n Mot. Dismiss 7, that stretches the case beyond its meaning.
[7] NC Capital's expert states, and MTI does not dispute, that decisions from other Canadian provinces are persuasive authority in Alberta. *See* Yorke-Slader Report ¶¶ 6–9.

contracts between 2004 and 2012 related to a nitric acid plant, an expander, and two rotors. *See id.* ¶¶ 9–17. Five of the contracts had forum selection clauses; the first two contracts, entered into in 2004, did not. *Id.* And two of the contracts (one of the 2004 contracts and one contract from 2009) related to a specific rotor, Rotor A. *Id.* ¶¶ 10, 14. The plaintiff sued, claiming that Rotor A had a defect and that the defendant knew of the defect and had a duty to warn the plaintiff of it. *Id.* ¶¶ 18–19. The forum selection clause in five of the contracts stated: "The rights and obligations of the parties under the Agreement as well as any dispute between the parties, shall exclusively be governed by and dealt with through the laws and courts of the Province of Alberta, Canada." *Id.* ¶ 22. The court compared the case to various other cases, noting whether the forum selection clauses in those cases "clearly stipulated that the clauses only applied to disputes arising out of or connected to the contracts which contained them." *Compare id.* ¶¶ 39, 40, 42, 44, *with id.* ¶ 43 (noting that the forum selection clause, which provided that "[a]ny disputes arising between" the parties would be within the exclusive jurisdiction of a particular province, "did not clearly stipulate that the clause was limited to disputes arising from the contract which contained it"). Though the forum selection clause in *Yara Belle* used the language "any dispute between the parties," *id.* ¶ 22, the court interpreted it as "restricted to disputes between [the parties] arising from and relating to the contracts containing the clause." *Id.* ¶ 47. The court gave a few reasons for this: first, other clauses in the contracts contained broader language (referring to claims based on warranty, statute, contract, tort, or any other basis); second, the clause was ambiguous as to whether it covered all disputes or disputes related to the contracts so it should be interpreted against the drafter, the defendant; third, the clause was incorporated into multiple contracts which suggested it was not intended to cover all disputes between the parties—if it did cover all disputes, it would not have been necessary to incorporate

it into each contract; and fourth, "[a] plain and common sense reading of the clause [as a whole] support[ed] an interpretation that the parties intended the words 'under this Agreement' to apply to the subsequent language of 'any dispute between the parties.'" *Id.* ¶¶ 48–52.

The forum selection clause is similar here in that it merely provides that "[t]he parties irrevocably attorn to the exclusive jurisdiction of the courts of the Province of Alberta" without language specifying for what disputes. For some of the same reasons as the *Yara Belle* court, this Court concludes that the provision is properly interpreted to apply to contract-related claims rather than all disputes between the parties. In the absence of language specifying what types of disputes are covered, it should be interpreted against MTI, the drafter. And because the clause follows a choice-of-law provision dictating the law governing the contract, common sense suggests that the choice-of-forum provision also applies only to contract-related claims.

That the clause is limited to contract-related claims, however, does not resolve the dispute. The Court must still determine whether NC Capital's claims are related to the contract. NC Capital and its expert suggest that the *Yara Belle* court broadly held that the forum selection clause "did not apply to claims sounding in tort." Yorke-Slader Report ¶ 7. But that is an overstatement of *Yara Belle*'s holding. The *Yara Belle* court considered whether the plaintiff's claims were, "in pith and substance, related to the contracts that contain[ed] the [forum selection] clause." *Yara Belle*, 2014 SKQB at ¶ 55. The plaintiff's "principal claim" was a tort claim for breach of the duty to warn. *Id.* ¶ 56. The court found that claim did not relate to the contracts with the forum selection clause, and thus was not covered by the forum selection clauses, because the claim "predate[d] the execution of those contracts." *Id.* ¶ 58. The court also noted that "the duty to warn exists outside of contract" and the plaintiff "would have a claim even if the five contracts were never executed." *Id.* ¶ 59. But one of the plaintiff's other claims was that the

13

defendant negligently inspected or repaired Rotor A.  *Id.* ¶ 61.  The court held that "[a]lthough the liability [for this claim] might lie in tort, the allegation [arose] from and [wa]s intimately connected to the contracts containing the forum selection clause."  *Id.* ¶ 63.  It explained that "there would be no claim for negligent inspection and/or repair if [the plaintiff] had not contracted with [the defendant] to perform repairs and maintenance to Rotor A."  *Id.*

Thus, *Yara Belle* holds that some tort claims can be covered by a forum selection clause limited to contract-related claims, and the relevant inquiry is whether the tort claims are intimately connected to the contracts, or whether the claim would exist absent the contract.  Under these principles, NC Capital's claims are related to the contract.  Without the Subscription Agreement, NC Capital would have no injury and no claims.  *See supra* Section II(a).  Though the liability arises from tort (or statute for the securities fraud claims), the allegations center on the fact that NC Capital purchased stock from MTI pursuant to the Subscription Agreement.

The other two cases cited by NC Capital's expert are distinguishable or unpersuasive.  *Barber v. Height of Excellence Financial Planning Group Inc.*, 2001 SKCA 135, ¶ 2 (Can. Sask. C.A.), Reply Ex. B, ECF No. 13-1 at 32–35, involved a broader array of claims than are at issue here.  More importantly, the court did not explain its reasoning—it was a brief oral decision, *id.*—so the Court does not find *Barber* persuasive.  And *Matrix Integrated Solutions Ltd. v. Naccarato*, 2009 ONCA 593 (Can. Ont. C.A.), Reply Ex. K, ECF No. 13-1 at 385–96, is factually distinguishable.  The plaintiff in *Matrix* sold and installed point-of-sale and other equipment for restaurants.  *Id.* ¶ 3.  The defendant was a supplier of point-of-sale hardware and software.  *Id.*  The parties entered a "Reseller Agreement" ("RA") in 2007 "whereby [the plaintiff] became an authorized, non-exclusive reseller of [the defendant's] products in Ontario."  *Id.* ¶ 4.  The RA contained a clause "providing . . . that the courts of Texas shall have exclusive

jurisdiction over suits arising out of or in connection with the agreement." *Id*. Two of the plaintiff's former employees left their employment with the plaintiff, started their own competing business, and signed an agreement with the defendant; at the same time, the defendant terminated the RA. *Id*. ¶ 5. The plaintiff brought suit alleging that the defendant participated in the former employees' breach of common law, trust, and fiduciary duties to the plaintiff. *Id*. ¶ 7. The court held that "the claims for breach of fiduciary duty . . . [could not] fairly be described as 'contractual in substance.'" *Id*. ¶ 11. Essentially, the plaintiff was alleging that the defendant assisted the former employees in breaching their fiduciary obligations, not its own obligations. *Id*. The RA was "merely part of the factual background that explain[ed] the existence and nature of the relationship that existed between [the plaintiff] and [the defendant] prior to the alleged wrongs that form[ed] the basis of th[e] action." *Id*. "The elements of the causes of action asserted d[id] not depend upon the RA, and the RA c[ould] be removed from the picture without undermining those claims." *Id*. Thus, the court held that the claims were not covered by the RA's forum selection clause. *Id*. ¶ 19. This case is factually quite dissimilar, beyond the obvious fact that NC Capital is not alleging that MTI aided another party in breaching its obligations to NC Capital. As explained above, *see supra* Section II(a), the investment NC Capital made pursuant to the Subscription Agreement is an element of each claim asserted by NC Capital. *Cf. Matrix*, 2009 ONCA at ¶ 18 ("The present case is not one where either claimant or defendant relies on the existence of a contractual obligation as a necessary element to create the claim, or to defeat it . . . ." (quotation marks omitted)). The Subscription Agreement does not merely explain the relationship between NC Capital and MTI, and it cannot be removed from the case without undermining NC Capital's claims.

In sum, whether the Subscription Agreement and forum selection clause are to be interpreted under American federal law or Canadian law, the forum selection clause covers the claims asserted by NC Capital in this case.  As the forum selection clause requires NC Capital's claims to be litigated in Alberta, Canada, the Court dismisses this suit under the *forum non conveniens* doctrine.

## CONCLUSION

Accordingly, Defendant Metabolomic Technologies, Inc.'s Motion to Dismiss Plaintiff's Complaint, ECF No. 10, and Motion for Leave to File a Reply in Support of its Motion to Dismiss, ECF No. 13, are GRANTED.  This case is dismissed under the *forum non conveniens* doctrine.  The Clerk is directed to file the reply, ECF No. 13-1, on the docket, then enter judgment and close the case.

Entered this 29th day of March, 2022.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
